## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, 1411 K Street N.W., Suite 1300 Washington, D.C. 20005, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| LIVING RIVERS PO Box 466 Moab, UT 84532 | |
| COLORADO RIVERKEEPER PO Box 466 Moab, UT 84532 | Civil Action No.: _____ |
| UTAH RIVERS COUNCIL 1055 East 2100 South, Suite 201 Salt Lake City, Utah 84106 | |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR 1849 C Street N.W. Washington, D.C. 20240,  and | |
| U.S. BUREAU OF RECLAMATION 1849 C Street N.W. Washington DC 20240-0001 | |
| Defendants, | |

## INTRODUCTION

1.      This lawsuit challenges Bureau of Reclamation's and U.S. Department of

Interior's (together "BuREC") failure to undertake an adequate environmental review, including

an accounting of the total amount of water in the Green River and the Colorado River Basin

("Basin") system and the Basin's water budget, prior to issuing the Green River Block Exchange

("GRBE") Contract that will allow new, additional water extractions from the Basin. The GRBE Contract provides new water extractions from the Green River of up to 72,642 acre-feet per year over a 50-year period, to be released by BuREC from the Flaming Gorge Dam, at a time when BuREC's own 2012 Basin Study shows that the water imbalance in the Colorado River Basin will be expanding. In addition, the timing and amount of water available in the Green River below the Flaming Gorge Dam is essential to endangered fishes and their habitats and the health of the entire Green River ecosystem, as well as to the region's recreational economy.

2.      In issuing the Finding of No Significant Impact ("FONSI") and environmental assessment ("EA") for the GRBE Contract, BuREC put aside any consideration of the current over-allocation of water in the Colorado River Basin water—unlawfully deferring that analysis to a later time and piecemealing its environmental review of the GRBE Contract and other pending projects that include, but are not limited to, the Lake Powell Pipeline contract and BuREC's Drought Contingency Plan agreements to address over-allocation.[1]

3.      In issuing the FONSI and EA, BuREC relied on outdated 2007 data and information and ignored Plaintiffs' concerns that the data must be updated to include recent scientific studies showing the water deficit in the Colorado River Basin is growing due to rising temperatures, persistent drought, and other factors. Just weeks after issuing the GRBE FONSI, as part of BuREC's response to a protest of another water rights application on the Green River from Water Horse Resources LLC, BuREC admitted that the 2007 data and information is outdated and should not be relied upon. BuREC stated "documents prepared by Reclamation in 2007 [] should not be relied upon to determine an amount of water now available for this project. The data used to determine availability of water on the Green River must be updated before any

---

[1] *See, e.g.,* Notice, Bureau of Reclamation, Responding to Historic Drought and Ongoing Dry Conditions in the Colorado River Basin: Request for Input, 84 Fed. Reg. 2244-45 (Feb. 6, 2019);

commitment to enter a contract to supply water for this project will be made. It is conceivable that current conditions will not support any new contracts for water."[2]

4.      This lawsuit challenges BuREC's attempt to break a large action into small component parts for the purposes of environmental review in order to obfuscate the combined significant impacts of the GRBE contract, the Lake Powell Pipeline contract, and the Drought Contingency Plan ("DCP") agreements on the environmental resources of the Basin.  Hence, BuREC violated the National Environmental Policy Act ("NEPA") and its implementing regulations by piecemealing environmental review of these interdependent and connected actions, 40 C.F.R. §1508.25(a)(1)(iii).

5.      Even if such a myopic analysis of the GRBE Contract were lawful, BuREC also failed to consider impacts of the GRBE Contract in concert with other past, present, and reasonably foreseeable future projects that may appear insignificant individually but which are very significant cumulatively.  BuREC violated NEPA and its implementing regulations by failing to fully consider all cumulative impacts of other past, present and reasonably foreseeable future actions affecting the same resources in its environmental review, 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

6.      In addition, BuREC's actions failed to comply with NEPA in other ways, including by failing to ensure scientific integrity in its choice of modeling to assess future water availability while ignoring other modeling and data, ignoring new and directly pertinent scientific studies and data regarding water availability, and failing to consider a reasonable range of alternatives.  BuREC ignored NEPA's fundamental requirement for actions significantly affecting the quality of the environment, that agencies must provide detailed information of the

---

[2] March 14, 2019 letter from BuREC to Utah State Engineer/Division of Water Rights. Available at https://waterrights.utah.gov/docImport/0611/06115910.pdf

impacts, consider alternatives, and disclose the relationship between local short-term actions and the maintenance and enhancement of long-term environmental productivity. 42 U.S.C. § 4332(2)(C).

7.      Plaintiffs, the Center for Biological Diversity, Living Rivers, Colorado Riverkeeper and Utah Rivers Council therefore challenge the Finding of No Significant Impact ("FONSI") and environmental assessment ("EA") that was prepared for the GRBE Contract by the Defendants, BuREC and DOI.

8.      Because Defendants failed to comply with the requirements of NEPA and its implementing regulations, Plaintiffs ask the Court to hold unlawful and to set aside the FONSI and vacate  the contract agreement pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and to declare that Defendants must fully comply with NEPA before entering into the GRBE Contract.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

10.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. Final agency action exists that is subject to this Court's review under the APA, 5 U.S.C. § 702, and the Council on Environmental Quality ("CEQ") regulations implementing NEPA, 40 CFR 1500.3.

11.      This Court may grant declaratory relief, and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. § 705, § 706(1), § 706(2)(A) & (D).

12. Venue in this Court is proper under 28 U.S.C. § 1391(e) because all Defendants

reside in this District.

## PARTIES

**A.    Plaintiffs**

13.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has more than 1.5 million members and online activists. The Center is headquartered in Tucson, Arizona, and has offices in Washington, D.C. and in regions throughout the country, and an international office in Baja California Sur, Mexico.  The Center is actively involved in wildlife and habitat protection issues throughout the United States and has members who reside or recreate in Utah and along the Green River. The Center's members and staff include individuals with educational, scientific, spiritual, recreational and other interests in protection of the Green River, the listed fish species and their critical habitat in this area.  The Center's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future. The Center and its members are harmed by the actions complained of herein, the Defendants' failure to comply with NEPA.

14.    Plaintiffs LIVING RIVERS is a nonprofit organization based in Moab, Utah that promotes river restoration through mobilization. By articulating conservation and alternative management strategies to the public, Living Rivers seeks to revive the natural habitat and spirit of rivers by undoing the extensive damage done by dams and water-intensive energy development on the Colorado Plateau. Living Rivers has approximately 1,200 members in Utah, Colorado and other states.  Living Rivers members and staff use the waters of the Green River

and Colorado River that would be affected by the GRBE Contract for quiet recreation and boating, scientific research, aesthetic pursuits, and spiritual renewal.

15.     Plaintiff COLORADO RIVERKEEPER is a licensed member of the Waterkeeper Alliance and the position is currently held by John Weisheit (who is also the Conservation Director of Plaintiff Living Rivers).  Colorado Riverkeeper has three licensed affiliate programs with the Waterkeeper Alliance: Green River Action Network; Upper Green River Network; and Las Vegas Water Defender. Waterkeeper members have boat liveries and perform numerous river patrols in the Colorado River Basin every year. Colorado Riverkeeper staff and affiliates are interested in maintaining the health of the Green River and Colorado River including in areas that would be affected by the GRBE Contract actions for quiet recreation and boating, scientific research, aesthetic pursuits, and spiritual renewal.

16.     Plaintiff UTAH RIVERS COUNCIL ("URC") is a nonprofit water sustainability and river management organization working to conserve water and protect aquatic habitat in Utah.  Located in Salt Lake City, URC has been working for 25 years to implement policies and activities to reduce Utahns' water use, protect flows for Utah's rivers and conserve river habitat on the Colorado River, the Green River, and their respective tributary rivers and streams.  URC is actively engaged in water rights issues and legislative solutions to Utah water problems and proposals, including inter- and intrastate water use and water diversion proposals on the Green and Colorado Rivers.  URC's members and staff reside primarily in Utah, and many of them reside along or near the Green and Colorado River and its tributaries.  URC's members and staff have educational, scientific, spiritual, recreational and other interests in the Green and Colorado Rivers and their protection and in the critical habitat those rivers provide to many plant and animal species, including endangered and sensitive fish species who find their home in the rivers.

URC's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.  URC submitted comments on the GRBE Contract draft Environmental Assessment on October 17, 2018. URC, its members, and its staff are harmed by the actions complained of herein, the Defendants' failure to comply with NEPA.

17.     The above-described recreational, scientific, cultural, inspirational, educational, aesthetic, and other interests of Plaintiffs would be adversely and irreparably injured by Defendants' failure to comply with NEPA. These are actual, concrete injuries to Plaintiffs and their members that would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law.

**B.     Defendants**

18.     Defendant the U.S. DEPARTMENT OF THE INTERIOR is the federal agency which oversees the Bureau of Reclamation and is responsible for the agency actions alleged herein. The Department of the Interior ("DOI") and is responsible for applying and implementing the federal laws at issue in this Complaint.

19.     Defendant the U.S. BUREAU OF RECLAMATION is a bureau within the U.S. Department of the Interior. The Bureau of Reclamation ("BOR") issued the FONSI that this Complaint challenges and is responsible for the agency actions alleged herein.

20.     The Department of Interior and Bureau of Reclamation are referred to collectively herein as "BuREC."

**LEGAL BACKGROUND**

**A.     NEPA**

21.     NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It was enacted with the ambitious objectives of "encouraging productive and

enjoyable harmony between man and his environment . . .[;] "promoting efforts which will prevent or eliminate damage to the environment and biosphere and stimulating the health and welfare of man; and enriching the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

22.     In order to achieve these goals, NEPA contains several "action-forcing" procedures, most significantly the mandate that all federal agencies must prepare an environmental impact statement ("EIS") to analyze and disclose the environmental consequences of major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

23.     The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations which are binding on all federal agencies.  *See* 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500–1508.

24.     When a federal agency is not certain whether an EIS is required, it must prepare a briefer analysis, known as an environmental assessment ("EA").  40 C.F.R. § 1508.9 (1978).  If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared.  40 C.F.R. § 1501.4 (1978).  If an EA concludes that there are no significant impacts to the environment, then the federal agency must provide a detailed statement of reasons explaining its conclusion that the project's impacts are insignificant and must issue a Finding of No Significant Impact ("FONSI").  40 C.F.R § 1508.13 (1978).

25.     An agency may only issue a FONSI for actions that have no significant impact on the human environment. *Id.* § 1508.13. If an action may have a significant effect on the environment, or even if there are substantial questions as to whether it may, the agency must

prepare an EIS. *See id*. § 1508.3.

26.     NEPA's regulations define "significance" in terms of "context" and "intensity." *Id*. § 1508.27. "Context" means the significance of the action must be analyzed in several contexts (e.g., national, regional, local), and include short- and long-term effects within the setting of the proposed action.. *Id*. § 1508.27(a). "Intensity" refers to the severity of the impact and requires consideration of a number of factors, and CEQ's NEPA regulations list 10 factors that may generally lead to a determination of "significance," including: (1) whether the action is likely to be highly controversial; (2) whether the effects on the environment are highly uncertain or involve unique or unknown risks; (3) whether the action may have cumulative significant impacts; and (4) whether the action threatens a violation of law. *Id*. §§ 1508.27(b)(4), (b)(5), (b)(7), (b)(10).

27.     In an EA or EIS, an agency must fully analyze all direct, indirect, and cumulative impacts from a project in its environmental analysis. *See id*. § 1502.16. "Direct effects" include those "which are caused by the action and occur at the same time and place." *Id*. § 1508.8(a). "Indirect effects" include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. *Id*. § 1508.8(b). Indirect effects may include growth-inducing and other effects related to changes in land use; population density or growth rate; and "related effects on air and water and other natural systems, including ecosystems." *Id*. "Cumulative impacts" result from the "incremental impact of the action" on the environment "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Cumulative impacts can result from individually minor but collectively

significant actions taking place over a period of time. *Id*. Cumulative impact analyses include

private, state, and federal actions. *Id.* § 1508.7.

28.     Connected actions that are closely related are to be analyzed in the same EIS, 40

C.F.R. § 1508.25(a)(1).  Connected actions include actions that automatically trigger other

actions, actions that cannot or will not proceed unless the other actions are taken previously or

simultaneously, and interdependent parts of a larger action that depend on the larger action for

justification. *Id*.  Similar actions that have common timing or geography are also best evaluated

together to assess the combined impacts or similar actions or reasonable alternatives. 40 C.F.R. §

1508.25(a)(3).

29.     NEPA requires that the information an agency uses in conducting its

environmental review must be "of high quality," and agencies must "insure the professional

integrity, including scientific integrity," of their discussions and analyses, and "shall identify any

methodologies used" and "scientific and other sources relied upon" for their conclusions. *Id.* §§

1500.1(b), 1502.24. "Accurate scientific analysis, expert agency comments, and public scrutiny

are essential to implementing NEPA." *Id.* § 1500.1(b).

30.     NEPA requires an agency to adequately consider alternatives to its proposed

action. The agency must "[s]tudy, develop, and describe appropriate alternatives to

recommended courses of action in any proposal which involves unresolved conflicts concerning

alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An agency shall "[r]igorously

explore and objectively evaluate all reasonable alternatives," "use the NEPA process to identify

and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse

effects of these actions upon the quality of the human environment," and "[i]nclude appropriate

mitigation measures" to minimize the negative impacts of a project. 40 C.F.R. §§ 1500.2(e), 1502.14(a), (f).

31.     An EA must also include a discussion of alternatives to the proposed action. 40 C.F.R. § 1508.9(b). Thus, each federal agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).  An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," including alternatives that are "not within the jurisdiction of the . . . agency." 40 C.F.R. § 1502.14(a), (c). In addition, an agency "shall state how alternatives … will or will not achieve the requirements of section 101 and 102(1) of the Act," which requires agencies to "use all practicable means" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of national heritage." 42 U.S.C. § 1502.2(d); 42 U.S.C. § 4331(b).  An agency must also determine how alternatives "will or will not achieve the requirements of . . . other environmental laws and policies." 40 C.F.R. § 1502.2(d). The alternatives analysis is considered "the heart of" an environmental analysis under NEPA. *Id.* § 1502.14.

32.     The CEQ regulations implementing NEPA further require that "public scrutiny [is] essential to implementing NEPA" and therefore, direct all federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made." 40 C.F.R. § 1500.1(b).

33.     NEPA requires that "agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. §

1501.2; *id*. § 1502.5 ("An agency shall commence preparation of an [EIS] as close as possible to the time the agency is developing or is presented with a proposal . . .").

34.     Underlying all of NEPA's procedural requirements is the mandate that agencies take a 'hard look' at all of the environmental impacts and risks of a proposed action.  This review cannot be superficial, rather agencies must take a "hard look" at the environmental consequences of proposed actions in light of comments submitted by the public as well as high-quality scientific information. This "hard look" standard ensures the agency gathers the needed factual information and provides sufficient information to support its conclusions.

35.     DOI has promulgated regulations to implement NEPA that largely mirror the NEPA CEQ regulations.  *See* 46 C.F.R. Subpart A-E.  BOR has adopted a Departmental Manual that provides guidance on NEPA which states that an EIS is normally required for "Proposed  . . . water service contracts . . . where NEPA compliance has not already been accomplished" and for " . . . proposed changes in the programmed operation of an existing project that may cause a significant new impact." 516 DM 14.4(A)(3), (4).  Both of these circumstances are present here.

 **B.     The Administrative Procedure Act**

36.     The APA provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702.  Final agency action exists that is subject to this Court's review under the APA, 5 U.S.C. § 702, NEPA, and the CEQ regulations implementing NEPA, 40 CFR 1500.3 (judicial review of agency compliance with NEPA and the regulations is proper after an agency "has made a final finding of no significant impact (where such finding will result in action affecting the environment)".

37.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

38.     The Defendants issued the final FONSI at issue here on February 13, 2019 and the GRBE Contract will result in actions by Defendants affecting the environment. Therefore, the FONSI is subject to judicial review at this time.

## FACTUAL BACKGROUND

### A.     The Green River and Colorado River Basin

39.     The Green River travels through some of the most scenic, culturally significant, archeologically significant, and remote landscapes in Wyoming, Utah, and Colorado.

40.     The river originates in the Wind River mountain range of Wyoming and then flows south to the Flaming Gorge Reservoir, which straddles the Utah-Wyoming border and is home to the Flaming Gorge Dam, a water storage facility in Utah originally authorized by the Colorado River Storage Project Act of 1956, 43 U.S.C. § 620.

41.     The stunning Flaming Gorge National Recreation Area above the dam provides ample recreation opportunities, where Utahns and others from across the country and the world come to enjoy boating, fishing, and waterskiing, and similar activities.  Below the dam, the Green River is a blue-ribbon fishery revered by fly-fishing enthusiasts.

42.     From Flaming Gorge, the Green River jogs east into western Colorado and then west back into Utah, passing through Browns Park National Wildlife Refuge and Dinosaur National Monument.  Inside the Monument, whitewater rafting enthusiasts from all over the world come to run the Gates of Lodore, and numerous outfitters make their living there.  The river continues on through the Uintah and Ouray Indian Reservation, the Ouray National

Wildlife Refuge, the Roan Cliffs and Desolation Canyon, Gray Canyon, Labyrinth Canyon, and

from there to the center of Canyonlands National Park, where it joins the Colorado River at a

spectacular confluence. This photo of the Green River winding through Canyonlands National

Park was taken near Horse Canyon by Plaintiff Riverkeeper.



43. The combined waters of the Green and the Colorado rivers carry on southward,

through Lake Powell, Lees Ferry, Grand Canyon National Park, and beyond into Mexico.

44. The Green River is by far the largest tributary to the Colorado River and as such,

is a key component of the water supply for the seven states comprising the Colorado River basin,

i.e., the Upper Basin states of Wyoming, Utah, Colorado, and New Mexico, and the Lower Basin

states of Nevada, Arizona, and California.

45. Recreational use abounds along the entire course of the Green River, whose

waters are essential to region's beloved outdoor endeavors such as fishing, swimming, rafting,

canoeing, hiking, and camping, just as they are to the region's thriving outdoor industry.  In

2019, 63 miles of the Green River was as protected under the Wild and Scenic Rivers Act, (16 U.S.C. § 1274(a)), with 49.2 miles designated as scenic, 8.5 miles designated as recreational, and 5.7 miles designated as wild. S. 47 (116th Cong., 1st Session), Public Law No.: 116-9.

46.     The Upper Colorado Basin, including the Green River, is home to four endangered fish species: the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub. One of the principal threats to the survival and recovery of these four fish species is habitat loss and reduction in historic range due to water diversions throughout the Basin. Relatively small amounts of water make all the difference in forming and maintaining essential backwater habitat on the Green River that is crucial for reproductive efforts of these four species of endangered native fishes. The EA states that all four of these endangered fish occur in the project area. In addition, the threatened yellow-billed cuckoo and proposed critical habitat occurs in the project area, and the endangered southwestern willow flycatcher, the threatened Mexican spotted owl, and the threatened Ute ladies tresses may occur in the project area. The project area also overlaps with designated critical habitat for the four endangered fish and the threatened Mexican spotted owl.

47.     In addition to the four fish species listed as endangered, numerous sensitive fish species occur in the project area including Colorado River cutthroat trout, flannelmouth sucker, bluehead sucker, roundtail chub, and mountain sucker.

48.     Interspersed along the Green River are numerous, fragile riparian areas and wetlands—crucial habitat for native vegetation and many birds, reptiles, and amphibians. Riparian habitat along the Green River and within places like the Ouray National Wildlife Refuge is critically important to the protection and restoration of these many declining fish and migratory bird species.

49.    The Colorado River Basin is currently over-allocated by approximately minus 1.34 million acre-feet per year[3] to minus 2.98 million acre-feet per year.[4]  More water has already been assigned through fixed allocations, and more water is being diverted from the system than is replenished each year to the system.  Bureau of Reclamation's 2012 Basin Study Executive Summary concludes (at p. 9) that water supply imbalance between natural supply and human demand in 2060 would total of 3.2 million acre-feet.[5]  Figure 2 of the 2012 Basin Study's Executive Summary (at p. 16) illustrates how demand has already exceeded supply in the Basin and how this imbalance will increase into the future:

**FIGURE 2**

Historical Supply and Use[1] and Projected Future Colorado River Basin Water Supply and Demand



---

[3] Colorado River Basin Water Supply and demand Study, Study Report, U.S. Department of the Interior Bureau of Reclamation, December 2012 ("2012 Basin Study").
[4] The twenty-first century Colorado River hot drought and implications for the future, Bradley Udall and Jonathan Overpack, March 24, 2017.
[5] 2012 Basin Study.

50.     The 2012 Basin Study assumes a reduction in natural Colorado River flow by 2060 of 9 percent.  However, Udall and Overpeck (2017) concluded that the reduction in natural flow will likely be 20 – 30 percent by mid-century.[6] The following tables show the increasing disparity between supply and fixed allocations between Upper and Lower basins and Mexico, along with losses to evaporation  through the middle of this century:[7]

**Supply: Colorado River Basin Upper Basin Flows**
**Measured at Compact Point**
**Lee's Ferry, Arizona**

| Year | Annual Average in million acre-feet | Notes and References |
|------|------|------|
| 1906 | 18.72 | Year 01 <br> <u>Natural Flow and Salt Data</u> |
| 1922 | 18.04 | Year 17 |
| 1956 | 15.59 | Year 50 |
| 2006 | 14.95 | Year 100 |
| 2010 | 14.9 | Year 104 <br> 2012 Basin Study Initiated |
| 2060 | 13.56 | Year 154 <br> 2012 Basin Study Projection <br> (-9%) |
| 2050 | 11.92 | Year 144 <br> Udall and Overpeck (2017) <br> Conservative Projection (-20%); |

---

[6] Udall, B. and J. Overpeck (2017), The twenty-first century Colorado River hot drought and implications for the future, Water Resour. Res., 53, doi:10.1002/2016WR019638. This study was referenced in Plaintiffs comments.
[7] Data for water supply from Bureau of Reclamation' Colorado River System Simulator ("CRSS") data sets: available at https://www.usbr.gov/lc/region/g4000/NaturalFlow/current.html .

**Fixed Allocations/Demand: Colorado River Basin**

| Allocation and System Evaporation | Amount in million acre-feet | Balance in million acre-feet |
|---|---|---|
| Mexico | 1.5 | 1.5 |
| Lower Basin Evaporation (Structural Deficit) | 1.2 | 2.7 |
| Compact Allocation Lower Basin (AZvCA) | 7.5 | 10.2 |
| 2007 Upper Basin Hydrologic Determination (DOI)[8] | 5.76 | 15.96 |
| Total Demand | | 15.96 |

51.     Although BuREC considered the GRBE Contract for 72,642 acre-feet per year over a 50-year period, during which the water imbalance in the Colorado River Basin will be expanding, as illustrated in the 2012 Basin Study Figure 2 above, BuREC failed to address how diverting even more water from the Green River will affect the growing water imbalance that requires meeting fixed allocations while  still reserving sufficient water to fulfill instream requirements for the endangered fishes and other uses in the Green River.

52.     Looking at the additional water use proposals in Utah in 2009,[9] the Utah Division of Water Resources explained that there is more "undeveloped water" being sought in Utah alone from the system than could be provided under the initial apportionment. These major undeveloped water users include the Northern Ute Tribe (105,000 AFY), the Utah Navajo

---

[8]  The Executive Summary of the Hydrologic Determination states: "On the basis of this hydrologic investigation, water depletions by the Upper Basin states from the Upper Colorado River Basin can be reasonably allowed to rise to an annual average of 5.76 million acre-feet (maf) per year, exclusive of Colorado River Storage Project (CRSP) reservoir evaporation from Lake Powell, Flaming Gorge Reservoir, and the Aspinall Unit."  Available at http://www.riversimulator.org/Resources/USBR/2007HydrologicDetermination.pdf

[9] *See* Living Rivers et al. EA comments at 12 incorporating Division of Water Resources. Upper Colorado River Basin, Current Policy and Issues Powerpoint Presentation. 2009. Slide 4 & 5. Accessed at https://www.waterrights.utah.gov/meetinfo/m20090930/upper_-colorado.ppt.

(81,500 AFY), the Green River Block for Uintah County (72,600 AFY), and the Lake Powell

Pipeline (86,000 AFY), (the grouped together as "Board of W R (et al.)."), among others

applications.



| | | Potential Depletion Approved Applications (Undeveloped) | |
|---|---|---|---|
| **Utah's Upper Colorado River Entitlement & Current Depletions** | | **Applicant** | **Quantity (Ac Ft)** |
| | | San Juan County WCD | 30,000 |
| | | Central Utah WCD | 29,500 |
| | | Board of W R (et al) | 158,000* |
| Utah's Apportionment (23%) | 1,369,000 AF | Wayne County WCD | 50,000* |
| | | Kane County WCD | 30,000 |
| Current Depletion | 1,007,500 AF | Sanpete WCD | 5,600 |
| | | Uintah County WCD | 5,000 |
| Remaining Depletion | 361,500 AF | Navajo Nation ? | 80,000 |
| | | Ute Tribe ? | 105,000 |
| | | TOTAL | 493,100 |

**B. The Green River Block Exchange Contract**

53.     The State of Utah, through the Utah Department of Natural Resource's Division

of Natural Resources ("DWR") first requested the GBRE Contract from BuREC in a letter dated

January 4, 2016 (the "2016 Contract Request").

54.     In the same letter, DWR requested a purportedly separate BuREC contract for the

proposed Lake Powell Pipeline (the "LPP Contract"), an as yet unpermitted project by which the

state proposes to deliver water from Lake Powell to Washington and Kane Counties in southern

Utah.  Washington County is intended to be the primary recipient of Lake Powell Pipeline water,

which has one of the highest per capita water use rates in the country.

55.     The water targeted by the GRBE and LPP Contracts comes from the same source

– Flaming Gorge Reservoir, which lies on the border between Wyoming and northern Utah.

56.     Flaming Gorge Reservoir (the "FG Reservoir") and the Flaming Gorge Dam (the

"FG Dam") are part the Colorado River Storage Project ("CRSP") Act of 1956.

57.     The FG Dam and deliveries of water from the FG Reservoir are managed by BuREC based on Annual Operating Plans. All waters released from Flaming Gorge Reservoir are waters stored by and under the control of BuREC for delivery to Lake Powell and other uses.

58.     Among the projects authorized under the CRSP act was the Central Utah Project ("CUP"), a complicated and multi-phased project designed to allow development of water from the Colorado River Bain for distribution to various population centers and agricultural areas in Utah.  The "Ultimate Phase" of the project is intended to develop the Uintah and Ute Unit projects, but it was later determined that the Ultimate Phase of the CUP would not proceed.

59.     In 1996, BuREC entered into an assignment agreement with DWR related to water reserved for the Ultimate Phase, a 156,890 acre-feet ("AF") depletion right (the "Ultimate Phase Water").  Under the agreement, Utah was entitled to develop, divert, and perfect waters released from the FG Reservoir "as permitted by law."

60.     Critically, and as BuREC itself has recognized, Utah's rights to Ultimate Phase Water are questionable because they were expected to lapse if they were not perfected within 50 years of their assignment, or by October 6, 2009.  Even if Utah's interest in Ultimate Phase water had not lapsed, its interest is still unperfected and contingent, and those rights may only be perfected through contract with BuREC to allow release of additional water.

61.     Labeling the GBRE Contract as an "exchange contract" is somewhat misleading. As noted, the assignment agreement does not provide any *current, perfected* water rights to be "exchanged."  Rather, because the FG Reservoir water is managed and under the control of BuREC, any proposed diversion must be supported by a contract with the BuREC.  Without the GRBE Contract, Utah could not issue *any* of the new water rights that are contemplated as part of the proposed "exchange."

62.     According to DWR's 2016 Contract Request, the GRBE and LPP Contracts are intended to allow Utah to make use of the Ultimate Phase Water, with 72,641 AF allocated to the GRBE Contract, and the remaining 84,249 AF allocated to the LPP Contract.

63.     Under the GBRE Contract, BuREC would store on DWR's behalf and permit the state to use releases from the FG Reservoir of up to 72,641 acre feet per year (the "Assigned Water"), purportedly for "development along the Green River."

64.     In "exchange" for this contractual right, Utah, through DWR, would agree to "forebear" depletions of its water rights arising from Article XV(b) of the Upper Colorado River Basin Compact ("CRBC"), which allow for the development and diversion of flows from the Green River and its tributaries downstream from the Flaming Gorge Reservoir (the "Compact Entitlement Water").  However, because the Green River is part of the Colorado River Storage Project and BuREC controls all releases from the Flaming Gorge Reservoir for delivery to Lake Powell and other uses, no diversions of additional water from the Green River would be lawful unless they were supported by a contract with BuREC for the water releases from Flaming Gorge Reservoir.  Simply put, without the GRBE Contract, Utah would have no ability to issue any new water rights on the Green River and therefore there are no actual, current perfected water uses to "forebear".

65.     For Utah, the stated benefit of the GRBE Contract is that the Assigned Water would provide a "more reliable water supply" for future development projects along the Green River.  However, the contract does not allow DWR to make calls for releases from the FG Dam; instead, DWR must rely upon BuREC's release schedule established under the 2006 Flaming Gorge Record of Decision (the "2006 ROD"), which sets forth BuREC's specific responsibilities

to manage the FG Dam to advance the recovery of the Green River's four endangered fish species.

66.     For BuREC, the stated benefit of the GBRE Contract would be increased flows in the Green River and its tributaries that, BuREC claims, would result from DWR's agreement to "forbear" the use of Compact Entitlement Water which is not currently perfected or used.  In turn, the alleged increased flows would facilitate BuREC's ability to comply with its obligations under the 2006 ROD.  This formulation of the contract is misleading because there is no actual, current water use that Utah will "forebear" and nothing in this contract increases or could increase the water available to the system.

## PROCEDURAL BACKGROUND

67.     In response to DWR's Contract Request, on September 16, 2018, Defendants issued and requested public comments on a draft Environmental Assessment (the "Draft EA") for the GRBE Contract.

68.     Defendants held a public meeting on the Draft EA on September 26, 2018, in Vernal, Utah.

69.     On October 22, 2018, Defendants announced an extension of the public comment period through November 2, 2018.

70.     Nearly 20 parties, including Plaintiffs, submitted comments on the Draft EA.

71.     Plaintiffs Living Rivers and Colorado Riverkeeper, joined by others including the Plaintiff Center for Biological Diversity, and Plaintiff Utah Rivers Council submitted detailed comments addressing key issues that were inadequately addressed in the Draft EA and that remain so in the Final Environmental Assessment (the "Final EA"), which BuREC issued in January 2019.

72.     Plaintiffs raised the critical issue of the Draft EA's failure to accurately or fully address changing hydrology in the Flaming Gorge Reservoir and the Colorado River Basin as a whole.  The Draft EA and the Final EA rely on data assessing water levels from the last 100 years that fail to account for drastic changes in climate and water supply.  Defendants' reliance on outdated hydrology research results in substantial overestimates in the amount of water available to protect endangered fishes, other species, and their critical habitat. As explained in Plaintiffs' comments and detailed above, water levels in the Green and Colorado Rivers are expected to decline and keep declining due to warming temperatures and climate change. Neither the Draft EA nor the Final EA accounts for these changes.  The U.S. Fish and Wildlife Service, the federal expert agency concerning impacts to endangered species, raised similar concerns:

> Reclamation's modeling is based on the 1906 through 2015 hydrologic record, with no consideration of hydrologic changes or trends associated with warming temperatures. Is it realistic to assume that the upper Colorado River basin hydrology in the future will look like that of the past, given recent research suggesting otherwise (e.g., USBR 2010; Udall and Overpeck 2017, McCabe et al. 2017; Xiao et al.2018)?

Letter from U.S. Fish and Wildlife Service to Bureau of Reclamation, RE: Draft Environmental Assessment (EA) Green River Block Exchange Contract, November 1, 2018 ("DOI Letter") (at 2).

73.     Plaintiffs' comments also point out that the environmental review for the allocation of water rights subject to the GRBE Contract – rights which already should have lapsed according to the BuREC itself – was premature and could not be properly assessed in isolation.  Upper Basin states are in the process of negotiating a comprehensive drought contingency plan ("DCP") to address future water shortages in the region, but that process is just now being completed.  DCP implementation must account for and coordinate the operations of the FG Dam with that of the Navajo and Blue Mesa Dams, which requires a full, programmatic

environmental impact statement before a determination can be made as to whether sufficient water quantities exist to satisfy the GBRE Contract and to protect other resources. Plaintiffs pointed out in their comment letters that tying up the waters subject to the GRBE Contract will make the DCP planning and implementation all the more difficult, and segmenting the environmental review of the GRBE Contract from the DCP environmental review will result in inadequate, piecemeal environmental review.

74.     Regarding the Drought Contingency Plan, the Upper Colorado River states, Wyoming, Colorado, Utah, and New Mexico, have each released its Upper Basin Drought Contingency Plan. The October 17, 2017, the Colorado River District Board of Directors of Colorado's Drought Contingency Plan presents an annual release from federal upper basin reservoirs of "up to about 2 million acre feet."[10] In spite of the fact that Colorado's Upper Basin Drought Contingency Plan was available prior to the GRBE Contract Draft EA release, no total upper Basin reservoir release is noted in the Draft or Final EA or the FONSI, and the EAs and FONSI contain no analysis that takes the impacts of these plans and the DCP agreements into account. As a result, the effects of DCP releases along with the GRBE Contract on the amount of upper Basin annual release remains unanalyzed by BuREC. Simply put, BuREC has failed to explain on the most basic level how the Drought Contingency Plan water releases and other water releases, including for the GRBE contract, can or will be accommodated from Flaming Gorge Dam in the context of declining water availability and given the reality of a water budget deficit across the Basin.

---

[10] Drought Contingency Planning and Colorado River Risk Study, An Overview and Status Report, Draft, October 17, 2017. Presentation available at https://www.coloradoriverdistrict.org/wp-content/uploads/2017/11/draft-drought-contingency-planning-and-colorado-river-risk-study-john-carron-10-17-2017-2.pdf

75.     As Plaintiffs' comments also explain, final approval of the GBRE Contract is premature in yet another important respect.  The Northern Ute and Navajo Tribes have federally-reserved and as-yet undeveloped rights to Ultimate Phase water that Utah seeks to reserve. Allocating the water under the GBRE contract fails to account for these rights and fails to consider the cumulative impact of the GBRE Contract on the Tribes' rights, which BuREC is obliged to account for and respect in fulfilling its water management duties.

76.     Plaintiffs' comments explained that BuREC's environmental review improperly segmented review of the GBRE Contract from the pending LPP Contract and Drought Contingency Plan agreements.  Despite Defendants' transparent attempts to characterize the contracts as separate, there is no serious question that the contracts are inextricably intertwined and that the cumulative impact of these contracts must be considered in combination.  Both the GBRE and LLP contracts seek to allocate the use of Flaming Gorge Reservoir water solely to Utah, which is critical not just to the Green River but also to the Colorado River Basin as a whole, which depends on these waters to support the levels of the Colorado River, Lake Powell, and Lake Mead.  Taken together, the GBRE contract, LPP project, and DCP agreements are connected actions that will significantly impact many resources, are interdependent with the larger division of Basin water, and depend on the larger division of Basin water for their justification.

77.     The other past, present, and future commitments for water allocations and new proposals are also related to the GRBE Contract. These include, Upper Colorado River Commission allocations, State of Wyoming water claims, Ute Tribe water claims, the Lake Powell Pipeline, Water Horse Resources water claims, Blue Castle Holdings Nuclear Power Plant water claims, Pinnacle Potash water claims, Enefit/Deseret Power water claims, Grand

County Water Conservancy District water claims, San Juan Spanish Valley Special Service District water claims, and the water deliveries to the Lower Colorado Basin States. All of these water uses should have been considered as part of the actions with cumulative impacts in the GRBE Contract EA but were not analyzed.

78.    A table summarizing some additional proposed Green River water commitments that were not included in the GRBE Contract EA follows:

| Proposed Green River Users not mentioned in GRBWRC EA & FONSI | Depletion in acre-feet per year |
|---|---|
| Flaming Gorge Release to Lake Powell (Upper Basin Drought Contingency Plan) | Potentially 2,000,000 |
| Lake Powell Pipeline | 86,249 |
| State of Wyoming | 80,000 |
| Water Horse Resources | 55,000 |
| Blue Castle Holdings-Nuclear Power Plant | 53,000 |
| Uintah Ouray Ute Nation | 50,000 |
| Pinnacle Potash | 20,000 |
| Enefit American & Deseret Power | 11,000 |
| TOTAL | 2,355,249 |

79.    In addition to the need to consider the GRBE Contract along with other connected actions in a single environmental review or as cumulative actions, Plaintiffs also pointed out other inadequacies in the Draft EA, including that: 1) an EIS is needed to consider the potentially significant impacts of the GRBE contract; 2) the modeling used in the Draft EA appeared to

minimize the impact of the action by ignoring the current science, persistent drought, and climate change; and 3) a reasonable range of alternatives was not considered.

80.     Plaintiffs' comments explained that an environmental impact statement ("EIS") should have been prepared for the GRBE contract. An adequate EIS would address potentially significant impacts of the project: on its own, particularly in low water years; together with the LLP and DCP; along with other past, present, and reasonably foreseeable actions that have cumulatively significant impacts. Plaintiffs also urged preparation of a full EIS because there is a substantial dispute as to the effects on many unique resources.

81.     Regarding the modeling used in the Draft EA, Plaintiffs explained that they were unable to discern how BuREC reached its conclusion that there would be no or minimal impacts from additional water withdrawals, a conclusion which contradicts other modeling and scientific studies. In the Final EA, BuREC stated that relied on a modeling run (Trace 63) as the worst-case scenario.  However, previous studies did not use Trace 63, which uses 1969[11] as the starting year, for the modeling worst-case scenarios. The choice to use Trace 63 as the worst case scenario for water availability contrasts with BuREC's different choice in its 2007 Interim Guidelines[12] and its 2012 Basin Study where the modeling run chosen was Trace 21.  Trace 21 shows an empty Lake Mead for decades under the business-as-usual scenario which includes the Upper Basin Depletion Schedule with the amount for Utah rising from under 1 million acre-feet per year in 2009 to 1.230 million acre-feet per year by 2060—which would still be less than the

---

[11] The FEA incorrectly states this was "1979", but Trace 63 is begins in 1969 (1906 +63 years= 1969).
[12] Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead, U.S. Department of the Interior Bureau of Reclamation Upper and Lower Colorado Regions, October 2007, https://www.usbr.gov/lc/region/programs/strategies/FEIS/index.html#VolI .

full allocation and could not accommodate all of the pending water rights including GRBE, LPP, and others.

82.     As a result, the Final EA fails to provide meaningful assessment of even the isolated impact of the GRBE Contract because BuREC arbitrarily and illogically used a modeling run (Trace 63), which was cherry picked to show minimal impact from the project.  In contrast, if Trace 21 were used as the worst-case scenario for evaluating the GRBE contract per the 2007 Interim Guidelines, it would show that taking any additional water out of the Green River system, even the 72,642 acre-fee per year included under this contract, would have a significant impact on the Green River and its resources.

83.     BuREC's choice of Trace 63 in its GRBE EA/FONSI ignores the effects of climate change on water availability in the system. Therefore, reliance on this Trace is contrary to the requirement that BuREC must use information "of high quality," and "insure the . . . scientific integrity," of their discussions and analyses in the environmental review. 40  C.F.R. §§ 1500.1(b), 1502.24.  Relying on Trace 63 precluded an accurate evaluation of impacts of GRBE contract itself and also undermined BuREC's ability to accurately assess those impacts along with the connected actions and cumulative actions that were largely ignored in the EA/FONSI. The EA also mischaracterized the "no action" alternative and failed to consider a reasonable range of alternatives.

84.     Defendants issued the Final EA in January 2019, after having purportedly considered and addressed the multiple third-party comments.

85.     Defendants signed and issued the FONSI shortly the completion of the Final EA, on February 13, 2019.

86.     Defendants' issuance of the Finding of No Significant Impact for the GRBE

Contract based on the Final Environmental Assessment was a final agency action under the

APA, 5 U.S.C. § 704.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the NEPA and the APA**
**(Failure to Prepare an EIS)**

87.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

88.     Under NEPA, Defendants are required to prepare an EIS for major federal actions

that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40

C.F.R. §§ 1502.4, 1508.3 ("*Affecting* means will or may have an effect on").  "Significant"

includes consideration of context and intensity and both short-term and long-term impacts are

relevant. 40 C.F.R. § 1508.27.  The intensity or severity of the impact must be evaluated in light

of various factors such as: the unique characteristics of the geographic area including proximity

to historic or cultural resources, parklands, wetlands, wild and scenic rivers or ecologically

critical areas; whether the action is highly controversial; whether it may have uncertain or

unknown risks; the degree to which the action may establish precedent for future similar actions,

whether there are cumulatively significant impacts; whether there action may adversely affect or

cause loss or destruction of significant scientific, cultural, or historic resources; the degree to

which the action may adversely affect endangered or threatened species and critical habitat; and

whether the action threatens a violation of law imposed for the protection of the environment. 40

C.F.R. §§ 1508.27(a), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7), (b)(8), (b)(9), (b)(10).  Many of these

factors are applicable here and show that the action may significantly affect various

environmental resources and, therefore, an EIS should have been prepared. 42 U.S.C. § 4332(2)(C).

89.     The area of the Green River affected by the project goes through Dinosaur National Monument and the Gates of Lodore, the Uintah and Ouray Indian Reservation, the Ouray National Wildlife Refuge, the Roan Cliffs and Desolation Canyon, Gray Canyon, and Canyonlands National Park. Impacts to these resources may be significant and should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(3).

90.     In the NEPA context, a project is considered "highly controversial" if there is a substantial dispute as to the size, nature, or effect of the action. 40 C.F.R. § 1508.27(b)(4).  Here, there is a substantial dispute as to the size, nature and effect of the action. The FONSI states: "Generally, hydrology of the Green River would not be affected in moderate to wet years (< 70 percent exceedance). There could be up to 300 cfs difference in dry years (> 70 percent exceedance) between the No Action and Proposed Action."   Yet as Plaintiffs explained in their comments, even if accurate, this amount of additional water extraction would be a significant difference that could adversely affect fish and other resources in dry years and the draft EA failed to explain how the modeling was done to reach these conclusions regarding the effects on hydrology. Defendant Department of the Interior's own U.S. Fish and Wildlife Service noted in its letter dated November 1, 2018 that the Draft EA's characterization of the changes to the flow regime as "insignificant" were not clearly supported and that the Draft EA did not provide this necessary information to the public:

> Much of the language contained within Section 3.3.1 (Hydrology) describes changes in Flaming Gorge releases and Green River discharge in relative qualitative terms such as: "insignificant", "nearly identical", "almost identical" "slightly lower", "negligible", etc. None of these terms provide *quantitative* descriptions of the change that allow the reader to understand the magnitude of the change.
>  . . .

It is unclear how 58,957 AF of additional releases from FG to offset Green River consumptive [uses] can be considered "essentially the same as" current releases, as this equates to roughly 300 cfs of additional releases over a 100-day irrigation season. Related, the statement is made on page 11 that "no change in operations is being considered", which seems inconsistent with the EA analysis.

DOI Letter at 2.

91.     Similarly, the project's effects on the environment appear to be uncertain and involve unique and unknown risks.  40 C.F.R. § 1508.27(b)(5).  For example, the Draft EA's conclusions regarding the lack of significant effects are based on modeling that used Trace 63 as the worst-case scenario, resulting in very different outcomes than if BuREC had used Trace 21, as BuREC used in its own 2007 Interim Guidance.  Further, the EA failed to account for changes in climate and warming trends.  Thus, the risks to the environment from the proposed changes in the Flaming Gorge Dam operations are uncertain and create unexamined risks.

92.     This action could establish a precedent for future actions with significant effects and represents a decision in principle about future consideration. 40 C.F.R. § 1508.27(b)(6). If the potentially significant impacts of the proposed changes to the Flaming Gorge operations that would be required under the GRBE Contract are allowed to be minimized and ignored through preparation of just a FONSI and EA, it may establish a precedent for future actions by Defendants.

93.     The action is also cumulatively significant when looked at in light of other related and pending actions, including the proposed Lake Powell Pipeline that proposes to use an additional 86,000 AF of water that would be released from the Flaming Gorge Dam. 40 C.F.R. § 1508.27(b)(7).  Other water rights applications are also pending that could remove additional water from this area of the Green River, including a 55,000 AF application from Water Horse Resources.  Taken together, these and other pending or reasonably foreseeable projects that

would impact the same action area in the Green River are cumulatively "significant," and therefore an EIS is required.

94.     The action threatens to cause loss or destruction of significant scientific, cultural or historic resources. 40 C.F.R. § 1508.27(b)(8). The native fish that will be adversely affected are significant scientific and cultural resources, as is the Green River riparian corridor. Desolation Canyon in Reach 3, below the Flaming Gorge Dam, is a Registered National Historic Place. Also, the Ouray Wildlife Refuge is leased to the USFWS by the Uintah Ouray Ute Tribe. (The refuge is tribal land).

95.     The action also may significantly impact endangered fish species and critical habitat as well as other listed species. 40 C.F.R. § 1508.27(b)(9).  The FONSI simply concludes that "No effect on fish and wildlife resources would be expected as a result of the Proposed Action." Yet the EA fails to support that conclusion or show how Defendants will ensure that outcome. Defendant DOI's U.S Fish and Wildlife Service letter of November 1, 2018 raised similar concerns, stating that the documents did not establish any firm commitment from the State to address any shortfalls or to ensure minimum, uninterrupted flow targets for endangered species.  DOI Letter at 1.

96.     Because the Green River Block Exchange Contract is a major federal action for the purpose of NEPA, *see* 42 U.S.C. § 4332(2)(C), that may have a significant impacts on the environment, the Defendants' adoption of a FONSI in reliance on an EA is improper.

97.     Because Defendants did not prepare an EIS, they have failed to comply with NEPA, and the issuance of the FONSI is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" that must be "set aside." 5 U.S.C. §§ 706(1), (2)(A).

## SECOND CAUSE OF ACTION
### Violation of NEPA and the APA
### (Unlawful Segmentation of NEPA Analysis)

98.     Defendants' segmented and piecemealed the analysis of the GRBE Contract from other pending matters that are directly related including the Lake Powell Pipeline project, and the Drought Contingency Plan.  All these projects will affect water availability and the many of the same environmental resources of the Green River and the Colorado River basin, including the endangered fishes.

99.     Most importantly, the GRBE Contract and the Lake Powell Pipeline project are "connected actions, interdependent parts of a larger action that depend on the larger action for justification," 40 C.F.R. §1508.25(a)(1)(iii), and therefore should have been considered together. As the EA states, the GRBE and LPP are tied together, both arising from the same transaction between the Defendants and the State of Utah regarding water rights.

> Reclamation received a letter dated January 5, 2016 from the State requesting two contracts for the use of its assigned water right (total of 158,890 AF depletion). One contract represents 86,249 AF depletion to be used for the LPP [Lake Powell Pipeline] proposed to be constructed by the State; the second contract, called the Green River Block, or simply GRB, represents the remaining amount of the assigned water right (72,641 AF depletion) to be used for development along the Green River. The purpose of the Exchange Contract is to facilitate a water exchange of 72,641 AF of depletions annually under the 1996 Assignment, which was previously included as part of a CRSP participating project water right. This contract is needed to resolve a long standing disagreement between Reclamation and the State regarding use of the water right assigned in 1996.

Final EA at 8. While the GRBE and LPP contracts appear to be technically separate contracts, they are inexorably intertwined.  It appears from reading the documents that Utah may use the water included in the GRBE contract to reserve water that it later utilized for the LPP as a hedge in case the LPP cannot be fulfilled due to inadequate water supply.  This is in part because Utah's need for the water under the contracts is not really extant at this time—i.e., Utah does not

need  but wants nevertheless to develop the  Upper Basin Water rights just to make sure no one else takes them.  The Green River block contract includes a goal of obtaining water for the LPP, and yet the relationship between the contracts is not adequately disclosed in the EA. The GRBE and LLP contracts are also necessarily intertwined on a more basic level, because the Green and the Colorado rivers belong to the same system, with the Green being the largest tributary to the Colorado, such that lower supplies and over-allocation in the Green River will affect the system as a whole.  Notably, the January 4, 2015, letter from Utah shows that the GRBE and LPP contracts are connected actions and noted they "would have simultaneous development timelines" and that it is Utah's desire to contract for the "Ultimate Phase" water that will allow Utah to "develop" this water right and "all its segregated portions."

100.    The DCP agreements are also connected actions that should have been considered in an EIS because they commit BuREC to specific releases of water from Flaming Gorge Dam in certain years. BuREC was required to consider how those releases and the releases under the GRBE contract, taken together, would affect the environment.  Neither of these releases were contemplated in the 2006 Flaming Gorge Dam operations EIS or ROD and must be considered now, together in a comprehensive environmental review before BuREC makes any irreversible and irretrievable commitment of resources.  42 U.S.C. §4332(2)(C).

101.    Defendants failed to address the whole of the environmental effects of the GRBE Contract and all other connected or related pending actions, and failed to meaningfully assess the combined environmental impact of each project to the same resources of the Green River.  By undertaking piecemeal review of these projects, Defendants understate the impacts of this action and also undermine a meaningful alternatives analysis.

102.    Therefore, Defendants failed to adequately analyze the environmental impacts of its actions in conjunction with other connected actions in violation of NEPA and its implementing regulations, and have also acted in a manner that is arbitrary and capricious and contrary to law in violation of the APA. 5 U.S.C. § 706.

**THIRD CAUSE OF ACTION**
**Violation of NEPA and the APA**
**(Failure to Adequately Analyze Impacts – Arbitrary and Capricious Environmental**
**Assessment)**

103.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

104.    NEPA requires that agencies consider the direct, indirect, and cumulative impacts of their proposed actions for all NEPA documents including Environmental Assessments (EAs). 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

105.    Defendants failed to take a "hard look" at the significant direct, indirect, and cumulative environmental effects of its actions in entering into the GRBE Contract.  Instead, the FONSI provides only bare conclusions and the EA provides only superficial analysis without the factual detail needed to explain the impacts to the public and without disclosing the basis for the conclusions reached. The documents do not show that Defendants gathered the needed factual information or provided sufficient information to supporting its conclusions. Relevant information was not made available to the public to facilitate meaningful participation and consideration of public comment. For all these reasons, the Defendants failed to comply with NEPA's "hard look" requirement.

106.    Agencies must also use information of "high quality," "insure the professional integrity, including scientific integrity," of their discussions and analyses, and identify "methodologies used" and "scientific and other sources relied upon" for their conclusions,

because "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* §§ 1500.1(b), 1502.24.  The FONSI found that the reductions in Green River water flows under the GRBE Contract would have minimal or no effect on environmental resources including all listed or sensitive species.  To reach these conclusions, Defendants failed to ensure scientific integrity by relying on a cherry-picked modeling run for the worst-case scenario that unfairly and erroneously minimized the potential effects of the action, and failed to address rising temperatures and persistent drought in assessing likely future water availability.  Despite a compromised public comment period, Plaintiffs raised concerns with the model based on the Colorado River System Simulator (CRSS) because the provided data was inconsistent with other modeling based on the same CRSS.  The Final EA identified Trace 63 as the model run used for the worst-case scenario, an inappropriate choice as Trace 63 is inconsistent with the modeling run choices used by BuREC in its own 2007 Interim Guidance and the 2012 Basin Study.

107.    These conclusory findings are based on unsupported conclusions that the reductions would be "negligible" and in reliance on model predictions. However, as Plaintiffs explained in their comments, because the model and all of its assumptions were not fully disclosed to the public, the conclusions are not supported.  In addition, information the Defendants did disclose about the model shows that the model relied on the past 110 years of water data, and gave equal weight to wet and dry periods despite the fact that climate change is predicted with strong certainty to decrease stream flows in the Colorado River Basin. As Plaintiffs noted in their comments, the period includes an abnormally wet time early in the historical record.  In addition, using a model that incorporates the reality of increasing temperatures and decreasing stream flow is essential in order to accurately understand how this

action will impact Flaming Gorge Reservoir and the ability to maintain minimum fish flows and meet other water needs below the dam.

108.   Even Defendant DOI's U.S. Fish and Wildlife Service stated that "It is not entirely clear *why* the modeling yields the results it does in the absence of additional description of the model operating rules" and raised further concerns that the modeling based on the 1906 through 2015 hydrologic record with no consideration of changes or trends associated with warming might not be realistic in light of recent research. DOI Letter at 1, 2.

109.   In addition, the EA failed to adequately address cumulative impacts.  Even if Defendants could address solely the GRBE Contract in a separate NEPA document (which Plaintiffs do not concede), Defendants failed to adequately address cumulative impacts, including by failing to meaningfully assess the environmental impacts of its action as it relates to other connected actions, both pending and reasonably foreseeable, and by failing to meaningfully assess the environmental impacts of its action as it relates to ongoing and reasonably foreseeable activities that will affect the same resources of the Green River.  As a prime (but not isolated) example, the agencies' water accounting methods and results in the EA for the impacted river systems are arbitrary and capricious, based on unsupportable assumptions.

110.   As a result, even if Defendants reliance on an EA was allowable in theory here, this EA failed to take a hard look at the impacts, did not provide an accurate scientific basis for its conclusions, and did not adequately address cumulative impacts from other past, present and reasonable foreseeable future actions that will impact the same environmental resources. Thus, Defendants failed to comply with NEPA. Because Defendants failed to adequately analyze the environmental impacts of the GRBE Contract violation of NEPA and its implementing

regulations, Defendants have also acted in a manner that is arbitrary and capricious and contrary to law in violation of the APA. 5 U.S.C. § 706.

<u>FOURTH CAUSE OF ACTION</u><br>
Violation of NEPA and the APA<br>
<b>(Failure to Consider a Reasonable Range of Alternatives)</b>

111.    Petitioners hereby incorporate all preceding paragraphs.

112.    NEPA requires that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" and "use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. §§ 1500.2(e), 1502.14(a); *see also* 42 U.S.C. § 4332(2)(E). This is vital, as a rigorous review of alternatives is considered to be "the heart of the environmental impact statement." *Id.* § 1502.14. Agencies must "use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." *Id.* § 1500.2(e).

113.    The EA only considered the Proposed Action and a No Action alternative.  The No Action alternative as described by the Defendants is inaccurate because it assumes the water extractions will occur even if the contract is not approved.  Defendants have a responsibility to consider meaningful alternatives under NEPA, but here they formulated the alternatives in such a way that there is little difference between the Proposed Action and No Action alternatives. Because the EA misleadingly frames this as an "exchange" rather than what it actually is—new water extractions—the EA failed examine a true "no action" alternative, one that would not result in the water being diverted from the Green River system, and did not explain that if BuREC did not enter the GRBE Contract, the water could not be used.  Because the alternatives presented in the EA and FONSI are not accurately described and the range of alternatives is

unduly narrow, the EA and does not comply with NEPA's mandate to rigorously explore and objectively evaluate all reasonable alternatives.

114.     Defendants' failure to explore and evaluate all reasonable alternatives violates NEPA and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter Judgment for Plaintiffs and provide the following relief:

(1) Declare that Defendants violated NEPA by failing to prepare an EIS to address significant impacts of the contract and that therefore Defendants' reliance on the EA and FONSI for the GRBE Contract  is arbitrary, capricious, and in violation of the law ;

(2) Declare that Defendants violated NEPA and the APA by unlawfully segmenting the analysis of the GRBE Contract from other related and pending actions that Defendants are considering regarding Green River water use and changes to the Flaming Gorge Dam operations – actions that will affect Green River water availability and impact the same environmental resources as the GRBE Contract.

(3) Declare Defendants violated NEPA and the APA by failing to adequately analyze impacts to environmental resources  in the EA by failing to rely on accurate current data and information on water availability in the context of rising temperatures and persistent drought, irrationally utilizing the CRSS modeling in a manner inconsistent with scientific integrity and the Defendant's own past, usual practice, and failing to

adequately identify and analyze cumulative impacts of past, present and reasonably foreseeable future projects that affect the same resources of the Green River .

(4) Declare Defendants violated NEPA and the APA by failing to consider a reasonable range of alternatives;

(5) Vacate and set aside Defendants' FONSI and approval of the GRBE Contract and remand this matter to Defendants for further proceedings consistent with this Court's order;

(6) Preliminarily and permanently enjoin the Defendants from taking actions in reliance on the GRBE contract until Defendants fully comply with the requirements of NEPA and the APA;

(7) Award plaintiffs their costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, Fed. R. Civ. P. 54(d); and

(8) Award plaintiffs any other relief that is just and proper.

DATED: March 21, 2018                          Respectfully submitted,

*/s/ William J. Snape*
William J. Snape, III (D.C. Bar No. 455266)
Center for Biological Diversity
1411 K Street, NW
Washington, DC 20005
(202) 536-9351
bsnape@biologicaldiversity.org
wsnape@wcl.american.edu

*/s/ Lisa Belenky*
Lisa Belenky (*pro hac vice* application pending)
Center for Biological Diversity
1212 Broadway St., Suite 800
Oakland, CA 94612
(510) 844-7107
lbelenky@biologicaldiversity.org

*Attorneys for Plaintiffs*