THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR, et al., <br><br> Defendant. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' REQUESTED RELIEF <br><br> Case No. 2:19-cv-00636-DBB-CMR <br><br> District Judge David Barlow <br><br> Magistrate Judge Cecilia M. Romero |

Plaintiffs Center for Biological Diversity, Living Rivers, Colorado Riverkeeper, Utah Rivers Council, and Sierra Club challenge the decision of Defendants United States Department of the Interior and United States Bureau of Reclamation (collectively, BOR) to enter into the Green River Block Exchange (GRBE) contract.[1] Having considered the parties' briefing,[2] the administrative record,[3] and relevant law, the court denies Plaintiffs the relief requested.

## I. STANDARD OF REVIEW

When reviewing agency action, the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

---

[1] Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief, ECF No. 20, filed June 21, 2019.

[2] The briefing in this case consisted of the following: Plaintiffs' Opening Brief, ECF No. 76, filed June 30, 2020; Federal Defendants' Opposition to Plaintiffs' Opening Brief, ECF No. 77, filed August 28, 2020; Intervenor-Defendants State of Utah and Utah Board of Water Resources' Opposition to Plaintiffs' Opening Brief and Support of Defendants' Opposition to Plaintiffs' Opening Brief, ECF No. 80, filed October 2, 2020; Washington County Water Conservancy District's Opposition to Plaintiffs' Opening Brief, ECF No. 81, filed October 2, 2020; Plaintiffs' Reply Brief, ECF No. 82, filed November 16, 2020.

[3] Federal Defendants' Notice of Filing the Administrative Record (AR), ECF No. 43, filed September 25, 2019.

otherwise not in accordance with law."[4] "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."[5]

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.[6]

"When called upon to review factual determinations made by an agency as part of its NEPA process, short of a 'clear error of judgment' we ask only whether the agency took a 'hard look' at information relevant to the decision."[7] "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action."[8] In sum, the court's review is "highly deferential."[9]

## II. STATUTORY SETTING

Congress enacted the National Environmental Policy Act (NEPA) recognizing the "profound impact" of human activity on the natural environment, "particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances."[10] "The centerpiece of

---

[4] 5 U.S.C. § 706(2)(A).

[5] *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation and internal quotation marks omitted).

[6] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (citation and internal quotation marks omitted).

[7] *Id.*

[8] *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1176 (citation and internal quotation marks omitted).

[9] *Id.* (citation and internal quotation marks omitted).

[10] 42 U.S.C. § 4331(a).

environmental regulation in the United States, NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."[11] "NEPA has two aims . . . , it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[12] It is "strictly a procedural statute" and does not require substantive results.[13]

NEPA requires that "[b]efore embarking upon any 'major federal action,' an agency must conduct an environmental assessment (EA) to determine whether the action is likely to 'significantly affect the quality of the human environment.'"[14] When the proposed action is not likely to significantly affect the environment the agency may issue a "[f]inding of no significant impact" (FONSI), which is a document explaining the findings and the reasons why an environmental impact statement (EIS) will not be prepared.[15] By contrast, an EIS is required for all "major Federal actions significantly affecting the quality of the human environment."[16] An EIS must "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize

---

[11] *Richardson*, 565 F.3d at 703.

[12] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1236–37 (10th Cir. 2011) (citation and internal quotation marks omitted).

[13] *Id.*

[14] *Richardson*, 565 F.3d at 703 (brackets omitted) (quoting 42 U.S.C. § 4332(2)(C)).

[15] 40 C.F.R. § 1508.13.

[16] 42 U.S.C. § 4332(C).

adverse impacts or enhance the quality of the human environment."[17] "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."[18]

In reviewing agency action for NEPA compliance, courts determine whether agencies have taken a "hard look" at the environmental consequences of their decisions.[19] Ultimately, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."[20] "This standard of review is 'very deferential' to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it."[21]

### III. BACKGROUND FACTS

This case challenges the adequacy of the BOR's environmental review of the GRBE contract pursuant to NEPA and the Administrative Procedure Act (APA). The GRBE contract was executed by the BOR and the State of Utah through the Utah Department of Water Resources.[22] The GRBE contract was designed to facilitate an equal exchange of water allowing Utah to use its water right apportionment under the authority granted to it by a 1922 compact,

---

[17] 40 C.F.R. § 1502.1.

[18] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

[19] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017); *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 340–41 (D.C. Cir. 2002).

[20] *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97–98 (1983).

[21] *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014).

[22] AR 11.

while still ensuring that the BOR's flow and temperature obligations are met below Flaming Gorge Dam.[23] The agency action at issue is the execution of the GRBE contract.[24]

In undertaking NEPA's required environmental review, the BOR issued a draft Environmental Assessment for public comment.[25] Plaintiffs were among the public commenters.[26] Following the public comment period, the BOR issued a Final Environmental Assessment (Final EA) and a Finding of No Significant Impact (FONSI).[27]

Pursuant to NEPA's requirements, the Final EA considered two action alternatives: a no action alternative and a proposed action alternative.[28]

> Under the No Action Alternative, [the BOR] and the State would not enter into an exchange contract. The State would remain free to develop their apportioned water right under the 1996 Assignment without the stability of Flaming Gorge (FG) stored water being released for this exchange. The State may run into shortages in years of drought, especially during the latter part of the summer when tributary flows can be significantly reduced."[29]
>
> The proposed Action consists of an exchange that would allow [the BOR] to meet Endangered Species Act (ESA) Upper Colorado River Recovery Program (Recovery Program) goals in the Green River, continue to operate FG Dam within the parameters of the 2006 Flaming Gorge Record of Decision (FGROD), and provide the State with a reliable water supply for development of the 1996 Assignment.[30]
>
> If the water exchange contract is implemented, the State would forebear the depletion of a portion of the Green River and tributary flows to which it is entitled under Article XV(b) of the Upper Colorado River Basin Compacts. . . . In

---

[23] AR 4–5, 28–29.

[24] *See* Opening Brief at 1–2.

[25] AR 784–879.

[26] *See, e.g.*, AR 652–65, 716–26.

[27] AR 24–293.

[28] AR 28–30.

[29] AR 28.

[30] AR 28.

exchange, the State would be authorized to deplete an equal amount of Colorado River Storage Project (CRSP) water from FG releases through the year as water is needed for the Green River Block portion of the assigned water right.[31]

The BOR analyzed a "total of 15 resources" based on the no action alternative and proposed action alternative.[32] The BOR found that with respect to hydrology, "[s]mall differences were predicted during the months of July–September during drier hydrologic conditions."[33] With respect to the remaining 14 resources, the BOR found "no effect or [a] similar determination."[34] Based on this environmental analysis, the BOR concluded that implementing the proposed action would not have a significant impact on the quality of the human or natural environment.[35] As a result, the BOR determined that an EIS was not required for the proposed action.[36] The BOR then signed the GRBE contract on March 20, 2019.[37] On March 21, 2019, Plaintiffs filed a complaint challenging the BOR's environmental review,[38] and on June 21, 2019, Plaintiffs filed an amended complaint—the operative complaint here.[39]

## IV. DISCUSSION

### A. The BOR's No Action Alternative Was Not Arbitrary and Capricious.

Plaintiffs argue that the BOR chose an improper no action alternative, including an improper environmental baseline, which undermined its analysis. Plaintiffs' argument centers on

---

[31] AR 29.

[32] AR 30.

[33] AR 30.

[34] AR 30–31.

[35] AR 31.

[36] AR 31.

[37] AR 1.

[38] ECF No. 1.

[39] *See generally* Amended Complaint.

the assumption that Utah would not use the water to which it currently has the rights and that it would certainly use the exchanged water rights. This assumption reflects Plaintiffs' mistaken claim that the agency action at issue is about the development of water rights.[40] The actual agency action at issue is the proposed execution of the GRBE contract.[41] Plaintiffs' fundamental misunderstanding of the agency action at issue renders their arguments meritless.

Plaintiffs contend that the "use of the term 'forebear' implies that a current use would be discontinued."[42] The Final EA states:

> If the water exchange contract is implemented, the State would **forebear** the depletion of a portion of the Green River and tributary flows to which it is entitled under Article XV(b) of the Upper Colorado River Basin Compact which expressly recognizes each compacting state's rights and powers to regulate within its boundaries the appropriation, use, and control of water apportioned and available to the states by the Colorado River and Upper Colorado River Basin Compacts.[43]

Plaintiffs' reading of the "forebear" statement to imply a current use is untenable. The statement is a conditional statement setting forth a future action: If the contract is implemented, the State would not deplete flows to which it is entitled. The statement does not purport to describe the current water use situation. Plaintiffs' argument is without merit.

Plaintiffs go on to argue that the Final EA should have analyzed the impact of a new use of water.[44] They contend that the BOR "implies that the water depletions that are the subject of

---

[40] *See, e.g.*, Opening Brief at 13 ("By failing to establish the correct baseline for its analysis—that the GRBE would not be an exchange, rather it would be a new appropriation of water—the agency failed to analyze and describe the negative impacts these new water withdrawals would have upon the entire river system.").

[41] *See id.* at 1–2.

[42] *Id.* at 16.

[43] AR 29 (emphasis added).

[44] Opening Brief at 16.

the 'exchange' are being used now and that the GRBE would shift the depletions to a new location pursuant to the proposed action, when in fact the most of the water at issue has not previously been used."[45] Plaintiffs conclude that "the true effect of the exchange would be new withdrawals of water from the Green River."[46] This argument relies on Plaintiffs' belief that pursuant to the Boulder Canyon Project Act of 1928 (BCPA)[47] the BOR does not have a right to any additional water from the system without the Department of the Interior's approval.[48] However, Plaintiffs misunderstand both the existence of Utah's current water rights and the BCPA. Utah currently has assigned water rights.[49] Indeed, the EA is premised on Utah having approached the BOR about "obtaining contracts" regarding its assigned water rights.[50] And further, Plaintiffs are mistaken in asserting that the BCPA impacts this matter because the BCPA only applies to the lower Colorado River Basin states, not the upper Colorado River Basin states like Utah.[51] Plaintiffs misunderstand the GRBE contract and the underlying water rights.

Pursuant to their misplaced reliance on the BCPA, Plaintiffs aver that it is within the BOR's discretion "to deny or limit Utah's use of Green River water."[52] There are two problems with this argument. First, Plaintiffs identify no basis for the BOR to deny Utah the use of its water rights. Plaintiffs have not directed the court to any authority that tasks the BOR with the

---

[45] *Id.*

[46] *Id.*

[47] 43 U.S.C. § 617 *et seq*.

[48] *See* Opening Brief at 16–17.

[49] 70 Cong. Rec. 324 (1928).

[50] AR 1707–08.

[51] *See Arizona v. California*, 373 U.S. 546, 575–85 (1963).

[52] Opening Brief at 16–17.

duty to identify all the water rights available and prioritize their use. Second, the court's NEPA review does not turn on whether the BOR has discretion in how it treats Utah's water rights. The question for the court is whether BOR acted in an arbitrary and capricious way by projecting that Utah likely would, in fact, exercise its water rights. There is nothing arbitrary about that assumption, which also is supported by the record.

In their reply, Plaintiffs shift their argument and aver that the no action alternative and the proposed action alternative are effectively the same.[53] This position is inaccurate. Utah would be able to develop its water rights under either alternative, but with different approaches and different effects. Plaintiffs also reiterate their averment that something more is required for Utah to exercise its right to develop the water.[54] These averments, however, do not bear on whether the BOR acted arbitrarily and capriciously. In sum, Plaintiffs' arguments are without merit. The BOR performed its duties as required by NEPA. With respect to whether the BOR used an appropriate no action alternative, Plaintiffs' request for relief is denied.

**B. The BOR's Analysis of Hydrology Impacts Was Not Arbitrary and Capricious.**

Plaintiffs argue that the BOR failed to identify the location of proposed withdrawals and return flows and to analyze hydrological impacts in Reach 3.[55] They contend that the Final EA makes assumptions about where the diversions occur, the location of which Plaintiffs say is

---

[53] Reply at 7–8.

[54] *Id.* (asserting that Utah must "enter into a water service contract with the United States" for Utah's water right to be developed, directed, and perfected).

[55] Opening Brief at 18–20 (citing AR 30); AR 283.

impossible and inaccurate.[56] Without the accurate information about the diversions, Plaintiffs assert that the information about flow and temperature in the Green River is also inaccurate.[57]

However, the BOR analyzed and discussed the hydrological impacts, modelling multiple scenarios. This included a "worst-case scenario, which was intended to conservatively overstate the potential effects on the environment."[58] The BOR used its "technical and scientific expertise" in deciding which models to employ in its analysis.[59] Courts "defer to agency expertise on questions of methodology unless the agency has completed failed to address some factor, consideration of which was essential to a truly informed decision whether or not to prepare an EIS."[60] Here, Plaintiffs have not demonstrated BOR's failure to address any factor necessary to an informed decision. That there are assumptions in the analysis and "uncertainties"[61] does not mean that the EA violated NEPA. Indeed, assumptions and a degree of uncertainty are a feature of many analyses. The law does not require NEPA analyses to be assumption- and uncertainty-free, but rather to take a "hard look" at the issues.[62] The scenario modelling here meets that standard. Finally, while Plaintiffs argue that the BOR did not analyze the impacts in Reach 3, the BOR actually did sufficiently analyze those impacts because the Reach 3 impacts are dependent

---

[56] Opening Brief at 18.

[57] *Id.*

[58] Opposition at 16; AR 30–31, 50–58, 119–49.

[59] Opposition at 18.

[60] *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) (internal quotation marks and citation omitted).

[61] Reply at 2.

[62] *See, e.g.*, *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781–82 (10th Cir. 2006) (disagreeing with Plaintiffs' argument that an assumption that a particular species was present in the habitat at issue violated NEPA's "hard look" requirement).

on the impacts in Reaches 1 and 2, which the BOR explicitly analyzed.[63] The BOR therefore met its obligation under NEPA, and its analysis of the hydrological impacts was not arbitrary and capricious.

### C. The BOR's Analysis of Climate Impacts to Hydrology and Fish Resources Was Not Arbitrary and Capricious.

Plaintiffs argue that the BOR's analysis of climate impacts to hydrology and fish resources was arbitrary and capricious.[64] Plaintiffs contend that the BOR did not take into account certain studies that show that the water availability in the Colorado River basin is likely to be significantly curtailed in the future.[65]

As with Plaintiffs' criticism of the BOR's methodology for analyzing the hydrological impacts, Plaintiffs' criticism of the studies the BOR relied on to analyze climate impacts is similarly unsupported by the law. The legal standard requires deference to the BOR's methodological choices[66] and to what studies the BOR considered.[67] The BOR discussed future water availability, considering the studies it thought important and using the methodology its expertise suggested.[68] That Plaintiffs preferred other studies to be included or have a different

---

[63] Opposition at 19 (citing AR 2, 93, 149); *see also* AR 93 ("Under the [Flaming Gorge EIS] and [Flaming Gorge Record of Decision], if [the BOR] meets flow targets in Reaches 1 and 2, then it is assumed that targets for Reach 3 (White River confluence to the Colorado River) are met.").

[64] *Id.* at 20–22.

[65] Opening Brief at 20–21 (citing AR 179, 198, 222–24); AR 114–49.

[66] AR 122–47.

[67] *See Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006); *Colo. Envtl. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999) ("[T]he fact that Appellants cite an expert who agrees with their position and alleges a lack of analysis is not dispositive."); *see also San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011) ("Setting the boundaries of the region to be analyzed involved technical and scientific judgments within the Federal Defendants' area of expertise, and their conclusion regarding which Class I sites to include in the analysis is one to which we defer.").

[68] AR 115–49.

view of what certain studies mean does not demonstrate a NEPA violation. "So long as the record demonstrates that the [BOR] followed the NEPA procedures . . . the court will not second-guess the wisdom of the ultimate decision."[69] Indeed, the BOR responded directly to the public comments in Appendix D, so any argument from Plaintiffs to the contrary is without merit.[70] The record reflects that the BOR followed the NEPA procedures, and therefore the court will not second-guess the BOR's decision. The BOR's analysis of the climate impacts to future water availability was not arbitrary and capricious.

### D. The BOR Took a "Hard Look" at Cumulative Impacts.

Plaintiffs argue that the BOR's failure to take a hard look at cumulative impacts was arbitrary and capricious.[71] Plaintiffs contend that the BOR only looked at future depletions in Utah, analyzing the other upper basin states' future depletions at 2018 levels;[72] that the BOR excluded approximately 60,000 acre-feet of predicted future Utah depletions from the cumulative impacts analysis;[73] and that the BOR failed to explain what projects it was including or excluding from the cumulative impacts analysis.[74]

Agencies must analyze the impact "on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[75] "[I]dentification of the geographic area within which [cumulative impacts] may

---

[69] *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 163 (10th Cir. 2002).
[70] AR 274–93.
[71] Opening Brief at 22–25.
[72] *Id.* at 24.
[73] *Id.* at 11; AR 117.
[74] Opening Brief at 24.
[75] 40 C.F.R. § 1508.7.

12

occur[] is a task assigned to the special competency of the appropriate agencies."[76] Here, the BOR's cumulative impact analysis was not arbitrary or capricious. The BOR explained "reasonably foreseeable" future water availability using a "rigorous definition of what reasonable foreseeable future depletions are in the Upper Basin."[77] The BOR explained its methodology for considering future water availability[78] and its hydrologic analysis.[79] And the BOR "explained the rationale for the scope of its cumulative impacts analysis."[80] The BOR "is entitled to [deference] in defining the scope of its cumulative impacts analysis."[81] Plaintiffs may disagree with these approaches; however, that disagreement does not lead to the conclusion that these approaches were arbitrary and capricious.

Plaintiffs also are incorrect that it was arbitrary and capricious for the BOR to exclude approximately 60,000 acre-feet of predicted future depletions. To be sure, the BOR explained why it did not include that 60,000 acre-feet—those depletions were outside of the "geographical boundaries" of the BOR's analysis.[82]

---

[76] *Kleppe v. Sierra Club et al.*, 427 U.S. 390, 414 (1976).

[77] Opposition at 27 (quoting AR 148); AR 148 ("Under this approach, a reasonably foreseeable future depletion is one which has state legislation, or a tribal resolution or federal Indian water settlement, or a federal finding of no significant impact (FONSI) or record of decision (ROD). These are the criteria of certainty that a future depletion would occur at a particular time and place. This is a conservative approach to modeling the alternatives and takes the strictest approach to defining what is included and excluded for the cumulative impact analysis required by the Council on Environmental Quality's regulations 40 CFR 1508.7").

[78] AR 51 (Three scenarios were compared in this analysis for each set of hydrology: (1) Upper Basin depletions held constant at 2018 (No Action Scenario); (2) Upper Basin depletions held constant at 2018 levels *plus* GRB depletions (GRB Depletion Scenario); and (3) Upper Basin depletions held constant at 2018 levels and GRB depletions *plus* reasonably foreseeable depletions held constant at 2060 levels (Full Depletion Scenario).").

[79] AR 115–47; AR 148.

[80] Opposition at 26.

[81] *Id.*; *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) (internal quotation marks and citation omitted).

[82] AR 117.

Additionally, Plaintiffs' contention that the BOR failed to identify what projects it included is inaccurate. The BOR created a table entitled "Reasonably Foreseeable Future Depletions Nodes in CRSS for the Ultimate Phase Modeling at 2018 and 2060 levels."[83] This table lists specific projects that it considered in its future depletions analysis.[84] Moreover, Plaintiffs have not pointed the court to any authority requiring the BOR to identify each potential project that was not considered in the cumulative impacts analysis. In sum, the BOR's "hard look" at the cumulative impacts was not arbitrary and capricious.

### E. The BOR Properly Determined an Environmental Impact Statement Was Not Required.

Plaintiffs argue that significance factors set forth by the Council on Environmental Quality (CEQ) demonstrate that the BOR should have prepared an EIS.[85] Plaintiffs go on to contend that the "context" of the proposed action and at least three of the CEQ "intensity" factors demonstrate the need for an EIS.

Plaintiffs characterize the context of the proposed action as "the water crisis in the entire Colorado River Basin," meaning that "in NEPA significance terms" the "context" "should be the entire Colorado River Basin, not just a certain stretch of the Green [R]iver in Utah."[86] However superficially appealing Plaintiffs believe their characterization of context to be in light of the currently increasing drought risk in the Colorado River Basin, the effect of using this artificially broad characterization of the decision at issue here would be to require enormous speculation

---

[83] AR 118.

[84] AR 118.

[85] Opening Brief at 26.

[86] Reply at 16.

about the existence, timing, and use of dozens or more undeveloped and unperfected water rights that go well beyond the scope of the BOR's decision. This characterization is far more broad than the GRBE contract supports, and furthermore, it conflicts with the "site-specific" notion of context defined in 40 C.F.R. § 1508.27(a) (2020). The relevant context here is "the effects on the locale,"[87] which the BOR analyzed in terms of hydrology; recreation; wetlands, riparian, noxious weeds, and vegetation; fish and wildlife resources; threatened and endangered species; sensitive species; socioeconomics; water rights; cultural resources; paleontology; floodplains; geology and soils; Indian trust assets; environmental justice; and hydropower generation and marketing.[88] The BOR's analysis of these fifteen resources demonstrates that it considered the "context" of the proposed action pursuant to NEPA.

The three "intensity" factors Plaintiffs contend are triggered by the BOR's action here are: (1) the degree to which the effects on the quality of the human environment are likely to be highly controversial, (2) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, and (3) the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.[89] Plaintiffs also argue that an EIS is required because the exchange would change the environmental status quo.[90]

The CEQ factors Plaintiffs identify are not clearly triggered here. First, the impacts on the human environment are not highly controversial. The fact that there is some public opposition

---

[87] *See* 40 C.F.R. § 1508.27(a) (2020).

[88] AR 30–31.

[89] *Id.* at 27 (citing 40 C.F.R. § 1508.27(b)(4) (2020)).

[90] *Id.* at 29–30.

does not mean that there is a controversy.[91] The court acknowledges that certain federal and state agencies raised concerns,[92] however, the BOR identifies its responses to each of these concerns.[93] Plaintiffs' dissatisfaction with the BOR's responses does not give merit to their claim that the BOR "failed to incorporate or even respond to comments and scholarly studies in the record."[94] Moreover, the BOR does not "create new legal controversy" in its discussion of the Boulder Canyon Project Act (BCPA). As discussed previously, case law establishes that the BCPA does not apply to the lower Colorado River Basin states.[95] Accordingly, the court finds that Plaintiffs have failed to demonstrate that the highly controversial factor is present or that it would, on the facts of this case, have required the preparation of an EIS.

Plaintiffs' argument about Reach 3 does not trigger the uncertainty factor because "under the FGEIS/ROD if [the BOR] meets flow targets in Reaches 1 and 2, then it is assumed that targets for Reach 3 are met."[96] The EA modeled a full-depletion scenario, and even in that "worst case scenario" did not find a significant impact to the environment.[97] Indeed, the EA provides that "[d]ue to uncertainties associated with future inflows into the system, multiple simulations were performed for each alternative to quantify the uncertainties in future conditions, and the modeling results are typically expressed in probabilistic terms."[98] The EA also discusses

---

[91] *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps. Of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012) (citation omitted).

[92] *See, e.g.*, AR 667–69, 692–95, 711–14, 754–78.

[93] AR 275–93.

[94] Reply at 15–16.

[95] *Arizona v. California*, 373 U.S. 546, 575–85 (1963).

[96] Opposition at 36 (citing AR 93, 142, 1888–97).

[97] AR 52, 56.

[98] AR 50–51.

its use of the Index Sequential Method to "provide[] the basis for quantification of the uncertainty and an assessment of the risk with respect to future inflows."[99] Given the level of deference afforded to the BOR in its analysis, including its modeled scenarios, Plaintiffs have not established that the uncertainty factor is present or would have required the preparation of an EIS.

Finally, the exchange contract does not set a precedent because the BOR's "decision not to prepare an EIS in this particular case does not and could not limit its discretion with respect to how it will undertake any future NEPA review of the LPP Project," because the FONSI was based on "this project's site-specific, environmental considerations."[100] The LPP Project is an entirely different project with its own site-specific, environmental considerations and so the BOR's analysis here cannot establish precedent for any future review of the LPP Project. The GRBE contract even states that it "does not establish any precedent or right for other exchanges."[101] For these reasons, the precedent intensity factor is not present here.

The BOR reasonably determined an EIS was not required for the proposed action. "Agencies need not prepare a full EIS if they initially prepare the less detailed environmental assessment (EA) and, based on the EA, issue a finding of no significant impact (FONSI), concluding that the proposed action will not significantly affect the environment."[102] In the Tenth Circuit, the decision to "issue a FONSI and not prepare an EIS is a factual determination

---

[99] AR 52.

[100] Opposition at 37.

[101] AR 6.

[102] *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (brackets, ellipsis, citation, and internal quotation marks omitted).

which implicates agency expertise."[103] Indeed, to find a NEPA violation based on a failure to prepare an EIS, the court must find that the agency committed a "clear error of judgment."[104]

For the reasons stated above, the court cannot conclude that the BOR made a "clear error of judgment" when it determined not to prepare an EIS.

## V. CONCLUSION

The BOR's decision was not arbitrary or capricious. Accordingly, the court denies Plaintiffs' claims for relief in their entirety.

Signed July 7, 2021.

BY THE COURT

David Barlow
United States District Judge

---

[103] *Id.* at 785 (citation and internal quotation marks omitted).

[104] *See Comm. To Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993); Reply at 14.